IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

OCTOBER 1998 SESSION

FILED

February 25, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. No. 03C01-9803-CR-00084 |
| Appellee, | * | UNICOI COUNTY |
| VS. | * | Honorable Lynn W. Brown, Judge |
| MARTIN PALMER JONES, | * | (Sentencing) |
| Appellant. | * | |

For Appellant:

Julie A. Martin
Attorney for Appellant
P.O. Box 426
Knoxville, TN 37901-0426
(on appeal)

David F. Bautista
District Public Defender

Robert Oaks
and
Deborah Huskins
Assistant Public Defenders
142 East Market Street
Johnson City, TN 37605
(at trial)

For Appellee:

John Knox Walkup
Attorney General and Reporter

Todd R. Kelley
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue, North
Cordell Hull Building, Second Floor
Nashville, TN 37243

David Crockett
District Attorney General

Lisa Nidiffer
Assistant District Attorney General
Johnson City, TN 37601

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

## OPINION

The defendant, Martin Palmer Jones, entered best interest pleas of guilt to two counts of felony murder and received sentences of life with the possibility of parole.[1] The trial court ordered the sentences to be served consecutively. In this appeal of right, the defendant argues that the trial court erred by imposing consecutive sentences in the absence of any aggravating circumstances. We affirm the judgment of the trial court.

On October 10, 1996, the fifteen-year-old defendant admitted in a taped interview with TBI special agent Shannon Morton, that on the previous day he had shot and killed the victims, John Harder and Marsena Ratliff. Only days earlier, he had stolen a car from a local college and burglarized a residence, stealing several guns. Armed with a .22 caliber rifle, he had driven up Unaka Mountain intending to cross into North Carolina. As he neared the top of the mountain, he recalled having passed an automobile parked at a scenic overlook. Deciding that he needed money, the defendant parked a short distance from the overlook and walked toward the victims intending to commit a robbery. When he saw the defendant approach, Harder asked for assistance in jump starting his car. The defendant did not reply and, without any warning, shot Harder once in the head. The defendant confessed that he shot Harder twice more because "he didn't look like he was dead ... I didn't want him to suffer." At that point, the defendant shot Ms. Ratliff, who had attempted to flee. He told officers that the weapon had to be cocked before each shot. After taking a dollar from Harder's pocket and ten dollars from Ms. Ratliff's purse, the defendant drug Harder's body a short distance. He denied having undressed Ms. Ratliff, sexually accosting her, or moving her body. While driving down the mountain, the defendant wrecked the stolen car. He then fled on foot to a

---

[1] See North Carolina v. Alford, 400 U.S. 25 (1970).

trailer where he was later taken into custody by North Carolina authorities. Shortly after his arrest, the defendant provided a similar statement to Chris Buchanan, chief detective with the sheriff's department of Mitchell County, North Carolina.

At the submission hearing on the Alford plea, the defendant denied killing the victims. He explained that he confessed to the killings only because an officer had informed him that "all the evidence was pointing towards me and it would be the best thing to do." He testified that he had stolen a car and driven to Unaka Mountain, where he parked and then walked to a waterfall. He claimed that someone stole his car during his absence and further stated as follows:

> I walked up the mountain and that's when I found the car.
> ... I wasn't aware the people were even dead at that time.
> And when I got to the car, when I looked over, and that's
> when I seen the people. And I got scared and I didn't
> want to be there so I got back in the car and I didn't see
> nobody around. ... [T]here was a .22 rifle laying beside
> the bodies when I walked up on them. ... I picked it up
> and put it in the car and drove on....

The defendant admitted that when he was taken into custody he had a .22 caliber weapon in his possession, Harder's driver's license, a ten dollar bill, and a one dollar bill.

TBI Agent Shannon Morton testified that on October 9, 1996, he responded to a call concerning a double homicide on Unaka Mountain. Upon arrival at the scene, he found the body of a woman near the front of a white automobile. She had been shot in the head several times and her clothing had been partially removed. He found the male victim, who had been shot several times in the head, located in the woods nearby. The body appeared to have been dragged from the parking lot. Shortly after his arrival, Agent Morton learned that an automobile had been wrecked about five miles from the murder scene on the North Carolina side of the mountain. Two hunters had informed officials that they had come upon the

3

wreck and talked with a young man, the description of whom matched the defendant. The hunters saw the defendant hiding weapons and other items in a wooded area. Officers established roadblocks and, later that evening, the defendant was apprehended and taken to the Mitchell County Sheriff's Department for questioning. When defendant's parents arrived, Agent Morton informed the defendant of his rights and recorded his statement. Agent Morton testified that the physical evidence found at the crime scene was consistent with the defendant's statement.

In accepting the plea, the trial court determined that Agent Morton's testimony established sufficient facts to constitute the offense. The trial court characterized the defendant's testimony as "absolutely incomprehensible" and determined that the defendant was guilty as charged.

At a subsequent sentencing hearing, Agent Morton testified that the murder weapon was a bolt action .22 caliber rifle which had been recovered from the defendant's wrecked vehicle. These facts were consistent with the defendant's pretrial statements. The officer also related that he had interviewed witnesses who had seen the defendant on Unaka Mountain on the day before the murders. Other witnesses had observed the defendant in the possession of a weapon near the murder scene only forty minutes or so prior to the shootings.

The autopsy reports indicated that Harder was shot twice in the head and three times in the body. Ms. Ratliff sustained three gunshot wounds to the head.

Kitty Mendez Ratliff, mother of the victim Marsena Ratliff, testified that

the death of her daughter was devastating for her and her husband. Linda Harder, mother of the victim John Harder, and Christy Harder, his wife, testified to the gravity of their loss.

Scott Wayne Verran, a teacher in Happy Valley High School in Carter County, testified that the defendant had been his student for six weeks. He described the defendant as quiet, withdrawn, and having average intelligence. David Allen Hughes, also a teacher at the high school, described the defendant as a somewhat interested, adequate student who did not pose disciplinary problems. Both teachers, however, confirmed that the defendant had a problem with truancy. Claudette Bennett, who had taught the defendant during elementary school, remembered him as a good student. School librarian Cheryl White characterized him as a quiet, average student. Holly Johnson, the fifth grade teacher of the defendant, remembered him as a pleasant, friendly child who was not disruptive. Rhonda Delfth remembered the defendant as non-violent and possessing average intelligence.

Ralph Sparks, an administrator for the Upper East Tennessee Regional Juvenile Detention Center, where the defendant was housed, described the defendant as non-violent and unusually cooperative. Sam Kerns, a jail supervisor of the Unicoi County Sheriff's Department where the defendant had been in solitary confinement, described the defendant as "a model prisoner" who was non-violent, courteous, neat and clean. Sam Garland, a friend of the defendant's family who had known the defendant all his life, testified that the defendant had been a polite child with very supportive parents.

Pauline Edmondson, in custody of the defendant from the age of three

5

months, adopted him when he was ten years old. She described her son as quiet, shy, independent, and non-violent. She stated that he had attended church most of his life. Ms. Edmondson, who could not identify any event that might have prompted the defendant to runaway, confirmed that her son had stolen a car later used in the murders and had been involved in a burglary. She expressed the belief that her son had not committed the killings because he had falsely admitted to acts in the past. Ms. Edmondson thought the case had not been adequately investigated.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). The record in this case demonstrates that the trial court made adequate findings of fact.

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976).  In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications.  Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors.  There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed
> . . . and . . . the aggregate maximum of consecutive
> terms must be reasonably related to the severity of the
> offenses involved.

Taylor, 739 S.W.2d at 230.  The Sentencing Commission Comments adopted the cautionary language.  Tenn. Code Ann. § 40-35-115.  The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[2] exist:

> (1)  The defendant is a professional criminal who has
> knowingly devoted himself to criminal acts as a major
> source of livelihood;
>
> (2)  The defendant is an offender whose record of
> criminal activity is extensive;
>
> (3)  The defendant is a dangerous mentally abnormal
> person so declared by a competent psychiatrist who
> concludes as a result of an investigation prior to
> sentencing that the defendant's criminal conduct has
> been characterized by a pattern of repetitive or
> compulsive behavior with heedless indifference to
> consequences;
>
> (4)  The defendant is a dangerous offender whose
> behavior indicates little or no regard for human life, and
> no hesitation about committing a crime in which the risk
> to human life is high;

---

[2]The first four criteria are found in Gray.  A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion.  See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).


In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, as now defined by subsection (b)(4) in the statute, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses.


In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." Wilkerson, 905 S.W.2d at 938.

The trial court based the imposition of consecutive sentences upon the classification of the defendant as a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4). It concluded that the defendant had been untruthful in his testimony and was remorseless for his crimes. The trial court also determined that the record supported the conclusion that the defendant demonstrated little or no regard for human life and had no hesitation about committing a crime in which the risk to human life was high: "[the defendant] armed himself. He planned a robbery. And, then he decided to kill. ... [H]e placed a greater value on the[ir] money ... than he did on their lives. So, there is no doubt that he is a dangerous offender." Furthermore, the trial court determined that the circumstances surrounding the offenses were aggravated:

> This involved the use of ... a bolt action firearm, a rifle that took time to operate. The bolt has to be moved before it will fire again. ... [H]e gave absolutely no warning ... He just starts shooting him, doesn't ask him for money. ... After he shoots Mr. Harder, Ms. Ratliff hollers and then starts running. And, as she is attempting to flee he shoots her. There is not heat of passion, no indication of any mental disturbance. This was not only felony murder ... it was also a premeditated murder. ... There was a conscious choice that he made to kill these people ....

Next, the trial court addressed the defendant's potential for rehabilitation, which was characterized as "extremely poor." The trial court concluded as follows:

> [T]ake a look at those pictures and see what he did to each of those individuals, and then wonder how could somebody go through their pockets. His confession says he turned Ms. Ratliff over and went through her pockets, and her face ... is full of bullet holes. There's no indication that he's struck then ... or ... now, or at all ... as to the horror of what he did. ... I can't understand someone who is absolutely cold. ... He's just sitting there calmly now ... as if ... he's watching a television program, and that's the way ... it's been the whole time. For rehabilitation to occur, [one] has to acknowledge what [one has] done. The first step ... is honesty ... and we

9

don't have it ... and that's a key to his ... potential for rehabilitation. ... There is no expression of regret .... No apology ... absolutely no remorse.

The trial court also determined that the aggregate length of consecutive life sentences reasonably related to the severity of the offenses and that due to the severity of the crimes, the public needed to be protected from the defendant. After determining that the defendant had no potential for rehabilitation, the trial court stated that the defendant would be "as much of a danger at age sixty-five ... as he was on that mountain ...." While considering the defendant's youth, the trial court ruled that lack of substantial judgment on the part of the defendant was not demonstrated by the proof and that consecutive sentences were justly deserved due to the seriousness of the offenses and necessary to avoid depreciating the very serious nature of these offenses.

In our view, the extensive findings by the trial court are supported by the record. The defendant showed no regard for human life and, by his own pretrial confessions, had absolutely no hesitation in shooting the defenseless victims. The explanation that multiple gunshots were motivated by mercy for the suffering of the victims is not credible. There were several aggravating circumstances: the defendant shot without warning and without provocation; the defendant had a prior criminal history, having stolen cars and burglarized a residence only days before the shootings; the defendant exhibited a lack of remorse and has refused to accept responsibility for his crimes. His lack of candor is evident. Because the defendant does not appear to be amenable to rehabilitation, the imposition of consecutive sentences may be necessary to protect the public from the possibility of future criminal conduct. The consecutive sentences are reasonably related to the gravity of the crimes.

Accordingly, we affirm the judgment of the trial court.

_____
Gary R. Wade, Presiding Judge

CONCUR:

_____
David H. Welles, Judge

_____
Thomas T. Woodall, Judge